IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| PAMELA DEANDA,<br><br>       Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Commissioner of Social Security,<br><br>       Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br>Case No. 1:12-cv-00041-EJF<br>Magistrate Judge Evelyn J. Furse |

Plaintiff Pamela DeAnda asks the Court[1] to reverse and remand the Social Security

Administration's final agency decision denying her Disability Insurance Benefits ("DIB") under

Title II of the Social Security Act.  (Pl.'s Br. 17, ECF No. 30.)  The Administrative Law Judge

("ALJ") determined that Ms. DeAnda did not qualify for benefits because she "was not under a

disability, as defined in the Social Security Act, at any time from April 1, 2007, the alleged onset

date, through September 30, 2009, the date last insured."  (ECF No. 19, the certified copy of the

transcript of the entire record of the administrative proceedings relating to Ms. DeAnda

(hereafter "Tr. __") 23.)  Having carefully considered the parties' memoranda and the complete

record in this matter,[2] the Court AFFIRMS the Commissioner's decision because the ALJ

applied the correct legal standards, and substantial evidence supports the challenged factual

determinations.

---

[1] In accordance with 28 U.S.C. § 636(c)(1) and (3) and Federal Rule of Civil Procedure 73, the
parties have consented to proceed before the undersigned United States Magistrate Judge.  (ECF
No. 27.)
[2] Pursuant to Civil Rule 7-1(f) of the United States District Court for the District of Utah Rules
of Practice, the Court elects to determine the motion on the basis of written memoranda and finds
oral argument unnecessary.  *See* DUCivR 7-1(f).

## FACTUAL AND PROCEDURAL HISTORY

Ms. DeAnda, born January 4, 1965 (tr. 97), alleges she suffers from, among other things, Fibromyalgia, Shingles, Bipolar Disorder, Anxiety Related Disorder, and Degenerative Disc Disease (Pl.'s Opening Br. 3-4, ECF No. 30), but claimed disability based on the degenerative disc disease prior to the hearing (tr. 107-108).  On October 20, 2008, Ms. DeAnda filed a Title II application for a period of disability and disability insurance benefits beginning April 1, 2007. (Tr. 9.)  The Social Security Administration denied the claim initially on February 3, 2009, and again upon reconsideration on April 30, 2009.  (*Id*.)  Thereafter, Ms. DeAnda filed a written request for hearing on May 15, 2009.  (*Id*.)  She appeared and testified at a hearing held on February 24, 2010 in Salt Lake City.  (*Id*.)

Ms. DeAnda worked in a fulltime position as a clerk for the Internal Revenue Service from 1998-2007.  (Tr. 140.)  At the hearing, Ms. DeAnda testified she had taken a medical absence from work since 2008.  (Tr. 56.)

Before her alleged disability onset date of April 1, 2007, Ms. DeAnda sought treatment for various complaints of pain including headache, right foot pain, and lower back pain.  (*See e.g.* tr. 252-54.)  These complaints began in 2005 and 2006.  (*Id*.)  Ms. DeAnda first saw Dr. Bruce Larsen in 2003, and he treated her over time for multiple ailments, including spinal problems and melanoma.  (Tr. 143.)  In April 2007, the month of Ms. DeAnda's alleged disability onset, she saw Dr. Larsen for complaints of fibromyalgia-type pain and cyst removal. (Tr. 365.)  During this visit, Dr. Larsen noted in his report that Ms. DeAnda had "migratory chronic pain" and "some drug-seeking tendencies," having "overused her medication th[at] month."  (Tr. 366.)  On a report from the same visit, Dr. Larsen described Ms. DeAnda as being "on chronic pain meds" and saying she took extra medication that month because of a

"'fibromyalgia' flare." (Tr. 365.) Dr. Larsen also noted Ms. DeAnda "may miss 0-4 days per month because of her fibromyalgia." (Tr. 370.)

On a number of occasions, Ms. DeAnda asked for pain medication but her physicians refused to prescribe her such medication or questioned her need for it. In May 2007, Ms. DeAnda saw a physician for complaints of groin pain. (Tr. 374.) During that visit, Ms. DeAnda noted that her contract[3] had changed with Dr. Larsen and that, as a result, she could obtain pain medications. (Tr. 374-375.) Ms. DeAnda returned the next day and saw another doctor, who noted she could return to work or school the following day. (Tr. 377.) In June 2007, Ms. DeAnda went to the emergency room complaining of chest pain. (Tr. 249-250.) According to the treating physician's report, Ms. DeAnda asked for different pain medication than the doctor had prescribed and questioned the point of going to the emergency room if they could not give her any stronger pain medication. (Tr. 250.) The doctor noted he was "personally not comfortable in prescribing" the medications Ms. DeAnda requested. (*Id*.) In July 2007, Dr. Larsen extensively described Ms. DeAnda's "narcotic-seeking behavior," remarking that the behavior "is well-documented, back as far as 4/2005." (Tr. 380.) Dr. Larsen opined that Ms. DeAnda complained of pain to other doctors as a result of his "trying to keep her from abusing controlled substances." (*Id*.) Dr. Larsen saw Ms. DeAnda on July 17, 2007 and expressed concern for her difficult history with prescription drug abuse and even a previous overdose attempt, noting that "[o]bjective findings for causes of chronic pain have been difficult to pinpoint, and her pain complaints have been somewhat migratory (pleurisy, back pain, shingles pain, foot pain, diffuse muscle aches, and groin pain have been recent examples)." (Tr. 384-385.) Ms. DeAnda continued to seek pain medication from various physicians, including Dr.

---

[3] The record indicates Ms. DeAnda has a "Narcotic contract with BDL [Dr. Larsen]" and that she may only obtain narcotics from Dr. Larsen. (Tr. 375.)

Sutherland, in August 2007, who did not want to take on her chronic pain management and explained to her that "chronic narcotics have no place in the treatment of the fibromyalgia and other options need to be recommended and/or [t]ried."  (Tr. 424.)

After Ms. DeAnda applied for disability, the Disability Determination Unit referred her to Dr. Richard Grow, Ed.D., for a Psychological Evaluation.  (Tr. 530.)  During the subsequent examination, Dr. Grow found Ms. DeAnda had reasonably logical thoughts, reasonably intact recent and remote memory, and that her mood, "if accurately described, is Bipolar II in nature." (Tr. 533-534.)  Dr. Grow further concluded that Ms. DeAnda could understand, remember, and carry out simple three step instructions, and noted she got along reasonably well with other people.  (Tr. 536-37.)  However, he warned that under work stress, Ms. DeAnda would become irritable, cry, and want to leave.  (Tr. 537.)

At her hearing before the ALJ, Ms. DeAnda testified to many limitations she suffers as a result of her pain.  (Tr. 28-58.)  However, the ALJ found Ms. DeAnda's testimony as to her pain and resultant limitations lacked credibility due largely to her drug-seeking tendencies.  (Tr. 16-21.)

## STANDARD OF REVIEW

42 U.S.C. § 405(g) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA").  The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards.  42 U.S.C. §405(g) (2010); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  The Commissioner's findings shall stand if supported by substantial evidence.  42 U.S.C. § 405(g).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994). The standard "requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotations marks and citations omitted). Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted). The court will "review only the *sufficiency* of the evidence." *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). The court does not have to accept the Commissioner's findings mechanically, but "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "displace the agenc[y's] choice between two fairly

conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Lax, 489 F.3d at 1084* (*quoting Zoltanksi v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*; 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## FIVE-STEP DISABILITY DETERMINATION

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation. *See* 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750-53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;

(4) The impairment prevents the claimant from performing his or her past work; and

(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. § 404.1520.  The claimant has the initial burden of establishing the disability in the first four steps.  *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).  At step five, the burden shifts to the Commissioner to show that the claimant retains the ability to perform other work existing in the national economy.  *Id.*

## ANALYSIS

In this case, the ALJ applied the five-step sequential disability evaluation and made the following findings of fact and conclusions of law with respect to Ms. DeAnda:

1. Ms. DeAnda "last met the insured status requirements of the Social Security Act on September 30, 2009."  (Tr. 11.)
2. She "did not engage in substantial gainful activity during the entire period from her alleged onset date of April 1, 2007 through her date last insured of September 30, 2010."[4]  (*Id.*)
3. "Through the date last insured, [Ms. DeAnda] had the following severe impairments: fibromyalgia; degenerative disc disease; osteoarthritis of the left upper extremity; and affective disorders."  (*Id.*)
4. "Through the date last insured, [Ms. DeAnda] did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*)
5. "[S]ince the alleged onset date and through the date last insured, [Ms. DeAnda] had the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a) except that such work could not require:
   - Lifting more than 8.5 pounds at a time 'less than occasionally';
   - Lifting and carrying lighter articles weighing more than 3-5 pounds occasionally, which means from very little up to 1/3rd of the day;
   - Standing or walking more than 15 minutes at one time, nor more than 2 total hours in an 8-hour day;
   - Sitting more than 15 minutes at a time, nor more than 6 total hours in an 8-hour day;

---

[4] The year 2010 is a typographical error with no bearing on the appeal.  (Pl.'s Br. 5 n. 3, ECF No. 30.)

- Note: as noted above, regarding standing/walking and sitting, to be as comfortable as possible, the claimant requires the option to make brief postural changes every 15 minutes as needed;
- Bending, stooping, twisting, or squatting on more than a 'less than occasional' basis;
- Work on the floor (e.g. kneeling, crawling, or crouching) on more than a 'less than occasional' basis and no climbing of flights of stairs (a few steps up or down not precluded);
- Overhead lifting or overhead reaching on more than a 'less than occasional' basis and no more than frequent reaching, handling, or fingering;
- Work at more than a low stress level, which means:
  o A low production level (where SGA jobs are classified as low, average, and high production);
  o Working essentially alone (e.g. no working with the general public);
- Work at more than a low concentration level, which means the ability to be alert and attentive to (and to adequately perform) only unskilled work tasks;
- Work at more than a low memory level, which means:
  o The ability to understand, remember, and carry out only simple work instructions;
  o The ability to remember and deal with only minimal changes in work instructions from week to week; and
  o The ability to remember and use appropriate judgment in making only simple work-related decisions." (Tr. 13.)

6. "Through the date last insured, [Ms. DeAnda] was unable to perform any past relevant work." (Tr. 21.)

7. Ms. DeAnda "was born on January 4, 1965 and was 44 years old, which is defined as a younger individual age 18-44, on the date last insured." (*Id.*)

8. Ms. DeAnda "has at least a high school education and is able to communicate in English." (*Id.*)

9. "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Ms. DeAnda] is 'not disabled,' whether or not [she] has transferable job skills." (*Id.*)

10. "Through the date last insured, considering [Ms. DeAnda's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [she] could have performed." (Tr. 22.)

11. Ms. DeAnda "was not under a disability, as defined in the Social Security Act, at any time from April 1, 2007, the alleged onset date, through September 30, 2009, the date last insured." (Tr. 23.)

In short, the ALJ found Ms. DeAnda had not engaged in substantial gainful activity since her alleged onset date because she had several severe impairments.  (Tr. 11.)  However, despite those impairments, Ms. DeAnda could still perform sedentary work and therefore did not qualify for DIB.  (Tr. 13.)  Ms. DeAnda challenges the ALJ's determination on four grounds.

## I.    Analysis of Ms. DeAnda's Impairments at Step Three

Ms. DeAnda makes numerous claims of error in the ALJ's performance of step three of the sequential evaluation process.  Step three asks whether any "medically severe impairment," alone or in combination with other impairments, equals any of a number of listed impairments in such severity so as to preclude "substantial gainful employment."  20 C.F.R. §§ 404.1525-404.1526 & pt. 404, subpt. P, App. 1.  If listed, or equivalent to a listed impairment, the ALJ presumes the impairment conclusively disabling.  *See id.* § 404.1520(d).  If unlisted, the claimant must establish at step four that her impairment prevents her from performing work she has previously performed.  *See id.* § 404.1520(e), (f).

First, Ms. DeAnda argues the ALJ erred at step three by finding that she did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed under 20 C.F.R. Part 404.  (Pl.'s Opening Br. 10, ECF No. 30.)  Ms. DeAnda contends that her condition would meet or equal the listings for lower back pain, for skin disorders, or for anxiety-related disorders.  (*Id*. at 11-12.)  Specifically, Ms. DeAnda argues that her degenerative disc disease satisfies listing 1.04 and that her shingles nearly meets listings 8.04 and 8.05.  (*Id*. at 11.)

Initially, the ALJ determined Ms. DeAnda does not meet any orthopedic listing under section 1.00 in 20 C.F.R. Part 404, Subpart P, Appendix 1 because "[t]here is no listing for fibromyalgia and there is no evidence of nerve impingement for the spinal disorder and the

shoulder does not significantly limit the claimant's function of the left upper extremity."  (Tr. 11.)  Despite Ms. DeAnda's argument that her condition met listing 1.04, the ALJ explained in a subsequent portion of the Decision that all radiological evidence failed to show "any significant nerve involvement" and that, on the whole, Ms. DeAnda's "clinical findings are totally inconsistent and therefore do not provide corroboration for significant spinal pathology."  (Tr. 17.)  The Court finds that substantial evidence supports the ALJ's finding with respect to Listings under section 1.00.

The ALJ also determined Ms. DeAnda's mental impairment did not meet the 12.04 listing.  (Tr. 12.)  Ms. DeAnda notes that the ALJ analyzed her impairments under 12.04 but that he had determined she had severe mental impairments of Anxiety Related Disorder and Bi-Polar Disorder.  (Pl.'s Opening Br. 12, ECF No. 30.)  She does not challenge his 12.04 analysis but implies that the ALJ should have undertaken a 12.06 analysis instead of a 12.04 analysis.  (*Id*.)  Regardless of whether the ALJ classified Ms. DeAnda's mental impairments as affective or anxiety related, the record makes clear he fully considered the alleged impacts of the mental impairments on Ms. DeAnda's daily life.  (*See* tr. 12.)  When considering 12.04, paragraph B requires the same analysis of impacts on the claimant's life experience as 12.06 requires, namely at least two of the following:  marked restriction of activities of daily living, marked difficulties maintaining social functioning, marked difficulties maintaining concentration, persistence, or pace, and repeated episodes of decompensation, each of extended duration.  Listing 12.06, like listing 12.04, alternatively requires a claimant meet the paragraph C description, namely that her mental impairment results in "complete inability to function independently outside the area of [her] home."  20 C.F.R. § 404, subpt. P, App. 1.  In his discussion of listing 12.04, the ALJ referred to Ms. DeAnda's "mental impairment" broadly, implying he did consider her anxiety

related disorder and bi-polar as her collective mental impairments.  (Tr. 12.)  Because the

paragraph B and C analysis is identical under listings 12.04 and 12.06, because Ms. DeAnda's

assertions about the impact of the impairments on her life do not change depending on how the

ALJ categorizes them, and because the ALJ conclusively found Ms. DeAnda's mental

impairments did not meet either paragraph's requirements, the Court disagrees with Ms.

DeAnda's implication that the ALJ failed to analyze her Anxiety Related Disorder or that any

such error caused any harm.

Finally, Ms. DeAnda urges the Court to consider her disability under listings 8.04 or 8.05

and criticizes the ALJ's failure to make factual determinations about these listings based upon

her shingles.  (Pl.'s Opening Br. 11, ECF No. 30.)  However, Ms. DeAnda did not claim her

shingles met a listing at the time of the ALJ's decision.  (See tr. 107-108.)  As such, the ALJ's

failure to analyze the shingles does not constitute error.  Even if the ALJ had analyzed the

shingles, Ms. DeAnda's own testimony disposes of the argument that she meets any of the 8.00

listings.  Discussing this impairment, Ms. DeAnda recognizes that her shingles "would meet a

listing under 8.04 or 8.05 if [she] continued to suffer extensive rashes despite treatment for 3

months."  (Id.)  She then argues that treating physician Elena Goncharova's notes do not

distinguish between fibromyalgia and shingles in the description of her pain management and

treatment extending from September 2007 to October 2008.  (Id.)  However, Ms. DeAnda's own

testimony belies this argument:  Ms. DeAnda accurately describes the 8.00 listings, but explained

at her hearing that she experiences the shingles about one time per month for up to seven days at

a time, not for three consistent months.  (Tr. 36.)  The 8.02-8.06 listings for skin disorder

categories all require "skin lesions that persist for at least 3 months despite continuing treatment

as prescribed."  20 C.F.R. § 404 subpt. P, App. 1.  Because Ms. DeAnda herself testified that her

shingles did not persist for three consistent months, the ALJ could not have found she met any of the 8.00 listings.

This Court finds that substantial evidence in the record supports the ALJ's finding that Ms. DeAnda does not meet or equal any of the Appendix 1 listings.

## II.  Evaluation of Treating Physician Opinion Evidence

Next Ms. DeAnda argues the ALJ failed to evaluate the opinions of treating medical sources properly, specifically claiming the ALJ erred by failing to give controlling weight to her treating physicians, doctors Sharman Sutherland, Bruce Larsen, and Gary Devries.  (Pl.'s Opening Br. 12, ECF No. 30.)  This argument misstates the standard by which an ALJ evaluates treating physician evidence.

An ALJ must evaluate every medical opinion.  20 C.F.R. § 404.1527(c).  A treating physician's opinion may merit controlling weight if the ALJ finds it "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider certain factors.  20 C.F.R. § 404.1527(c) provides these factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

See Watkins v. Barnhart, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (citation omitted).  To reject a medical opinion, the ALJ must provide "specific, legitimate reasons" for doing so.

*Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (quoting Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1996)).

Yet the ALJ's decision need not *discuss explicitly* all of the factors for each of the medical opinions. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review). When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) (reflecting the ALJ's duty to resolve conflicting medical evidence). In addition, an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, *5, *1996 WL 374188* (July 2, 1996).

While the ALJ did not ascribe specific weight to each doctor's opinion by name, he did discuss their findings at length and then concluded that "[i]t is difficult to give significant weight to these findings." (Tr. 20.) He first reasoned that Ms. DeAnda herself lacked credibility because "the well documented medical records [demonstrate] that the claimant understands how to communicate with doctors to get what she wants." (*Id.*) The ALJ also refused to give significant weight to findings that Ms. DeAnda had to miss up to 4 days of work per month or that she could not sit, stand, or walk more than two hours per workday because these assessments "relie[d] on the statements and representations of the claimant, which [he did] not find to be reliable." (*Id.*) The ALJ cited at least six different parts of the record of Ms. DeAnda's medical providers as the basis of his finding that "[h]er drug seeking behavior is very obvious on reading the records of her constantly shifting sources of complaints of pain and rotating excuses for using more than the amount of prescribed pain medications." (Tr. 16.) Credibility determinations, as

further discussed below, remain the province of the ALJ, and the Court will not overturn them if substantial evidence supports the determinations. *See Hackett v. Barnhart*, 395 F. 3d 1168, 1173 (10th Cir. 2005). Here, the ALJ cites to medical findings throughout the record to determine Ms. DeAnda lacks credibility and appropriately gives limited weight to doctors' opinions derived from her non-credible subjective claims.

This Court thus rejects Ms. DeAnda's argument that the ALJ failed to give appropriate weight to the medical opinions in the record.

### III. Rejection of Ms. DeAnda's Subjective Pain Complaints

Ms. DeAnda argues the ALJ failed to include all impairing conditions, particularly her pain, and that he failed to undertake the analysis that SSR 96-4p *1996 WL 374187* (July 2, 1996) requires when a claimant alleges pain as a disabling factor. (Pl.'s Opening Br. 16, ECF No. 30.) SSR 96-4p, *2, provides, in relevant part, that an individual's symptoms such as pain "will not be found to affect the individual's ability to do basic work activities…unless medical signs and laboratory findings show that there is a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptom(s) alleged."

"'Credibility determinations are peculiarly the province of the finder of fact, and [a court] will not upset such determinations when supported by substantial evidence.'" *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir.1990)). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" *Id.* (quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988)). If objective medical evidence shows a medical impairment that produces pain, the ALJ must consider the claimant's assertions of severe pain and decide the extent to which the ALJ believes the claimant's

assertions.  *Id.* (citation omitted).  But this analysis "does not require a formalistic factor-by-factor recitation of the evidence.  So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied."  *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

In this case, the ALJ examined Ms. DeAnda's credibility and pain complaints in detail, referring back to her various doctors' evaluations and opinions.  (Tr. 13–21.)  The ALJ found that Ms. DeAnda had medically determinable impairments that one would reasonably expect to cause pain.  (Tr. 16.)  However, the ALJ did not find Ms. DeAnda's assertions regarding the limiting effects of the pain concerning intensity and persistence credible.  (*Id.*)  The ALJ examined the record for any objective medical evidence to support the complaint and provided specific reasons for the credibility accorded Ms. DeAnda's pain complaints, as discussed at length above.  (*Id.*)  In his findings, the ALJ explained that "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record."  (Tr. 14.)  The ALJ criticized Ms. DeAnda's myriad pain triggers, noting that "[a]pparently any kind of external condition increases her pain" and also that her "complaints of pain have been consistent, but not in location or cause."  (Tr. 17.)

Ultimately, the ALJ continued that "[w]ith the variety of complaints and the pattern of complaints it is difficult to tell if she is requesting medication for the pain or complaining of pain to get the medications.  The overall record suggests strongly the latter is the case."  (Tr. 18.)  As a result, and in consideration of the multiple citations to medical opinions on the record as discussed above, the ALJ did "not give significant weight to the objective evidence of

degenerative disease of the spine, fibromyalgia, or any other possible cause of pain." (*Id.*) The ALJ further explained that he did "not find the claimant's complaints and allegations of pain or mental symptoms or any related functional limitations to be reliable, and they [were] weighted accordingly." (Tr. 19.)

Because the ALJ set forth specific evidence to support his determination of Ms. DeAnda's lack of credibility, this Court finds no error in the ALJ's rejection of her subjective complaints as to pain. *See Qualls*, 206 F.3d at 1372.

### IV. Step Five Analysis: Jobs in the National or Regional Economy

Finally, Ms. DeAnda argues the ALJ erred in his Step Five finding Ms. DeAnda not disabled because she could perform other work existing in significant numbers in the national economy. (Pl.'s Opening Br. 7, ECF No. 30.)

At step five of the sequential evaluation process, the ALJ determines whether the claimant can perform other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ may determine that a sufficient number of jobs exist by relying on the testimony of a vocational expert, 20 C.F.R. § 404.1566(e), or by relying on the Medical Vocational Guidelines, 20 C.F.R. § 404.1655(d), among other things. The ALJ will consider a claimant disabled if she cannot perform her past work or other work in the national economy. 20 C.F.R. § 404.1505(a).

"Identified jobs must be shown to exist in 'significant numbers' in the regional or national economies. 42 U.S.C. § 423(d)(2)(A)." *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). In *Trimiar v. Sullivan*, the appellant raised an issue that "require[d] th[e] Court to address what constitutes a 'significant number' for purposes of the statute." *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992). The Court refused to draw a bright line as to what

number of jobs constitutes a "significant number" on the basis that "each case should be evaluated on its individual merits." *Id.* The Court did, however, note several factors that enter a proper evaluation of what amounts to "significant" numbers, as enumerated by the Eighth Circuit to include: "the level of claimant's disability; the reliability of the vocational expert's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on." *Id*. (citing Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir.1988) (quoting Hall v. Bowen, 837 F.2d 272, 275 (6th Cir.1988)). "The decision should ultimately be left to the [ALJ's] common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Id*. (citation omitted).

In this case, at Step Five the ALJ noted that although Medical-Vocational Rule 201.28 would otherwise direct a finding of "not disabled" on the basis of Ms. DeAnda's having the residual functional capacity to perform the full range of sedentary work, she had additional limitations on her abilities. (Tr. 22.) For this reason, the ALJ questioned the vocational expert "[t]o determine the extent to which these limitations erode the unskilled sedentary occupational base" of jobs Ms. DeAnda could perform. (*Id*.) The vocational expert then testified that 20,000, 7,000, and 6,000 jobs existed in the national economy for nut sorter, level vial sealer, and clock mounter, respectively. (*Id*.) The vocational expert testified that 1.5% of these jobs would exist in the local economy. (*Id*.) Ms. DeAnda points out that that percentage would result in up to 495 jobs in the local economy. (Pl.'s Opening Br. 8, ECF No. 30.) As discussed, *Trimiar* did not announce a bright line rule for what constitutes a "significant number" of jobs. Rather, it announced a guideline for the factors an ALJ must consider in making his determination as to whether a significant number of jobs exist.

Ms. DeAnda asserts the ALJ did not address any of the criteria *Trimiar* sets forth.  In so arguing, Ms. DeAnda misunderstands that court's holding.  The analysis in *Trimiar* makes plain that an ALJ need not explicitly discuss those factors—rather, the record must reflect that these factors entered into the ALJ's calculus in determining whether jobs existed in significant numbers.  *Trimiar*, 966 F. 2d at 1331-1332.  Review of the ALJ's decision reveals he did consider at least the level of Ms. DeAnda's disability (tr. 13-21), the reliability of the vocational expert's testimony (tr. 22), and the types and availability of such work (tr. 22-23).  The ALJ notably also found Ms. DeAnda had only "mild" limitations in her ability to get around by herself, which relates to another of the *Trimiar* factor (the distance one must travel to reach the job).  (Tr. 12.)  These factors all played a part in the ALJ's determination.

As a result, the Court finds substantial evidence supports the ALJ's finding Ms. DeAnda not disabled at Step Five because a significant number of jobs existed in the national or local economy that Ms. DeAnda could perform.

## CONCLUSION

For the foregoing reasons, the Court AFFIRMS the decision of the Commissioner.

DATED this 11th day of March, 2014.

BY THE COURT:

Evelyn J. Furse
United States Magistrate Judge